Douglas A. CARSON, Petitioner,

v.

STATE of Alaska, Respondent.

No. S–2262.

Supreme Court of Alaska.

Sept. 17, 1987.

Kevin F. McCoy, Asst. Public Defender, Kenai, Dana Fabe, Public Defender, Anchorage, for petitioner.

James V. Gould, Asst. Atty. Gen., Anchorage, Grace Berg Schaible, Atty. Gen., Juneau, for respondent.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

### ORDER

On consideration of the petition for hearing filed July 6, 1987, and response thereto,

IT IS ORDERED:

The petition for hearing is denied.

---

COMPTON, Justice, with whom RABI-NOWITZ, Chief Justice, joins, dissenting.

In my view the court of appeals has decided a significant question of law, having substantial public importance to others than the parties to the present case. It is a question not heretofore decided by this court. The decision affects the right of citizens of this state to protect themselves from the apparent attempted use of *unlawful* deadly force[1] by a peace officer. Thus I would grant the petition for hearing. Appellate Rule 304(c). Tentatively, my view is that the analysis of the court of appeals should be rejected.

In essence, the court of appeals holds that since a peace officer may lawfully *threaten* to use deadly force against a suspect in situations in which deadly force may not be lawfully used, the suspect may not lawfully respond self-defensively until deadly force is used in fact. No matter that a suspect reasonably believes a peace officer is commencing an act which if unchecked will result in the unlawful use of deadly force, the suspect may not lawfully defend against it until it is "an actual—as opposed to a threatened—use of deadly force." *Carson v. State*, 736 P.2d 356, 361 (Alaska App.1987).

It will be of little comfort to the seriously physically injured (and no comfort to the deceased) suspect that had he or she withstood the unlawful deadly force, self-defense then would have been legally permissible.

A peace officer has a qualified privilege to use force which would not be otherwise lawful. How much force a peace officer may lawfully use, and in fact uses in a given context, is only one inquiry to be made.

Self-defense is likewise a qualified privilege, legalizing conduct which would not be otherwise lawful. Thus a related but separate inquiry is under what circumstances a suspect may lawfully employ self-defensive conduct, and the nature of the self-defensive conduct employed.

The fact that a peace officer has a qualified privilege to threaten to use deadly force should not of itself abrogate the qualified privilege to use self-defense. The relevant statutes do not compel such a result, nor does any rationale expressed in the decision of the court of appeals support it. Indeed, the court of appeals does not address the issue from the standpoint of the suspect's perspective.

The conduct of an apparent aggressor provides the context within which the other actor allegedly responds self-defensively. We need not determine whether an apparent aggressor is an aggressor in fact. That is important, but not necessarily dispositive. We need also to determine what effect the apparent aggressor's actions have in provoking a self-defensive response from the other actor.

The legal analysis articulated in *Weston v. State*, 682 P.2d 1119 (Alaska 1984), exemplifies well established general principles of self-defense:

> Thus, to employ self-defense a defendant must satisfy both an objective and subjective standard; he must have actually believed deadly force was necessary to protect himself, and his belief must be one that a reasonable person would have held under the circumstances.

*Id.* at 1121.[2] We noted that "some evidence" must be presented by a defendant to place the defense in issue, and that the evidence must be viewed in a light most favorable to the defendant, without questioning his credibility, to determine whether this burden has been satisfied. Indeed,

---

1. AS 11.81.900(b)(12) provides:

   "deadly force" means force which the person uses with the intent of causing, or uses under circumstances which he knows create a substantial risk of causing, death or serious physical injury; "deadly force" includes intentionally discharging or pointing a firearm in the direction of another person or in the direction in which another person is believed to be and

   intentionally placing another person in fear of imminent serious physical injury by means of a dangerous instrument; ...

2. Although we were commenting in part on AS 11.81.335, "Justification: Use of deadly force in defense of self," the objective/subjective standard is a common law standard.

the court of appeals acknowledges this analysis. *Carson*, 736 P.2d at 359–361.

In commenting on the objective standard and whether a reasonable person would have acted in self-defense under the circumstances, "[w]e emphasize that the question is not whether Weston was in actuality mistaken in this belief." *Weston*, 682 P.2d at 1121. We then quoted with apparent approval from *Brown v. United States*, 256 U.S. 335, 343, 41 S.Ct. 501, 502, 65 L.Ed. 961, 963 (1921), in which Justice Holmes stated "[d]etached reflection cannot be demanded in the presence of an uplifted knife." 682 P.2d at 1121–22.

The same concern about "detached reflection" noted in *Weston* is present in *Carson*. In a confrontation between a peace officer and suspect, there may be a point after which a reasonable person will believe that the peace officer's threatened use of deadly force has given way to its actual use, as indeed it may have. Once actual use of deadly force has been apparently commenced, the right to respond ought not be denied, even though the suspect may be "in actuality mistaken in this belief." *Weston*, 682 P.2d at 1121. The issue of reasonableness should be one for a jury properly instructed.

The prejudice to Carson is obvious. As noted by the court of appeals, the actual use of deadly force in this case would have been per se excessive. *Carson*, 736 P.2d at 359. Further, viewing the evidence in a light most favorable to Carson, "Carson reached out and placed his hand on the nightstick, *to prevent [peace officer]*

*Klamser from hitting him." Id.* at 360 (emphasis added). Thus if a jury found that Carson reasonably believed that Klamser's threatened use of deadly force had given way to its actual use, the state would have had to disprove the defense beyond a reasonable doubt. AS 11.81.900(b)(15)(B). The instructions given by the trial court were legally incorrect in part and hopelessly confusing.[3]

As a result of this decision, the statutorily defined right to self-defense becomes largely illusory within the context of peace officer and suspect. Few suspects will wait until a night stick[4] strikes them before instinctively responding self-defensively. Of those who foolishly wait until struck, fewer still will be able to respond at all.

---

**3.** The court instructed only on the portion of AS 11.81.370 dealing with the use of nondeadly force and the threat of deadly force. The court's instruction provided:

> A peace officer may use nondeadly force and may threaten to use deadly force when [and] to the extent he reasonably believes it necessary to make an arrest.
>
> The use of force in making an arrest is not justified unless the peace officer reasonably believes the arrest is lawful.

*Carson*, 736 P.2d at 359.

With respect to permissible use of force to resist an arrest, AS 11.81.400, the court instructed:

> A person may not use force to resist the arrest of himself by a peace officer who is known to him or reasonably appears to be a

police officer, whether the arrest is lawful or unlawful, unless the force used by the police officer exceeds that allowed by law.

> The use of force justified in resisting arrest may not exceed the use of force justified in defense of self.
>
> Therefore, unless the state has proved beyond a reasonable doubt that the defendant did not act in these circumstances, you shall find the defendant not guilty.

*Id.* at n. 3.

**4.** In this case, Carson was allegedly defending against a blow from a night stick. He was also kicked in the "groin," attacked and bitten by a police dog, and knocked to the ground from behind. *Carson*, 736 P.2d at 360.